**FILED**

November 07, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
LRT

DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.:  A-23-CR-100** |
| **Plaintiff** | |
| **v** | **SUPERSEDING INDICTMENT** |
| **NATIN PAUL** | |
| **a/k/a Nate Paul,** | **[Ct. 1: 18 U.S.C. §§ 1343, 1349 – Conspiracy to Commit Wire Fraud;** |
| **Defendant** | **Cts. 2-4: 18 U.S.C. § 1343 – Wire Fraud; and** |
| | **Cts. 5-12: 18 U.S.C. § 1014 – False Statements to Lenders]** |

**THE GRAND JURY CHARGES:**

**Part One:  Introduction**

1.      Defendant,

**Natin Paul a/k/a Nate Paul**

is a commercial real estate investor based in Austin, Texas in the Western District of Texas. Paul has been in the commercial real estate business since 2007.

2.      Paul has founded and controls numerous companies that engage in the commercial real estate business.  The names of many of Paul's companies include the words "World Class" or the letters "WC."   (The companies founded and controlled by Paul in connection with his commercial real estate business are sometimes referred to hereafter collectively as "World Class companies.")

3.      When Paul establishes a company for the purpose of owning a particular parcel of real estate, the name of the company often includes the street address of the property, such as "WC 56 East Avenue, LLC," or a nearby intersection such as "WC 4th and Rio Grande, LP."  Or

the name of the company may incorporate the name of the property, such as "WC Met Center, LLC" or "WC Thousand Oaks Center, LP."

4.      Paul employs, or engages the services of, individuals who act as his agents and at his direction in connection with his commercial real estate business (hereafter sometimes referred to as Paul's "associates").  Some of Paul's associates were also co-conspirators described below in Count One of this Superseding Indictment.

5.      During his career in commercial real estate, Paul has repeatedly engaged in deception to persuade individuals and organizations to entrust money to him, and he has used the money to enrich himself and expand the commercial real estate business that he controls.

6.      Paul has also engaged in deception to conceal his wrongful actions, such as his violation of his promises to the individuals and organizations from whom he has obtained funds.

7.      Paul's acts of deception have violated a number of criminal laws of the United States of America, including laws prohibiting criminal conspiracy, wire fraud, and false statements to financial institutions.

**Part Two:  Fraud Against Limited Partners**
**(Counts One through Four)**

**Introduction and Summary**

8.      Beginning no later than 2011 and continuing at least until 2013, Paul created limited partnerships for the purpose of acquiring parcels of real estate.

9.      The limited partnerships included, but were not limited to: WC Thousand Oaks Center, LP, which acquired a retail center in San Antonio, Texas; WC 6th and Rio Grande, LP, which acquired a restaurant building in downtown Austin, Texas; WC 4th and Rio Grande, LP, which acquired a music venue building in downtown Austin, Texas; WC Metropolitan Northtown, LP, which acquired retail centers in Des Plaines, Illinois and Coon Rapids,

Minnesota; and WC Huron Denver, LP, which acquired a retail center in Thornton, Colorado (hereafter sometimes referred to collectively as "the relevant limited partnerships").

10.     The following facts were true about each of the relevant limited partnerships.

11.     The limited partners were individuals and organizations that invested money in the limited partnership, and the general partner was a limited liability company, managed and controlled by Paul, that had a name similar to the name of the limited partnership.  For example, the general partner of WC Thousand Oaks Center, LP was "WC Thousand Oaks Center GP, LLC," with "GP" standing for "general partner."

12.     Paul created the limited partnerships for the purpose of investments in specific assets.  Paul and his associates did not promote the limited partnerships as, and the limited partners did not understand them to be, investments in other World Class companies or in a combined fund over which Paul would have unlimited discretion.

13.     In the limited partnership agreements that Paul signed as the manager of the general partner when the limited partnerships were first formed, Paul falsely promised and represented that the general partner would segregate the limited partnership's assets and use them for the exclusive benefit of the limited partnership.

14.     Paul and his associates did not intend to abide by those promises and representations.  When Paul created the limited partnerships that are relevant to this Superseding Indictment, Paul and his associates were already secretly following business practices that were contrary to those promises and representations.  Paul and his associates intended to use, and routinely did use, the funds of limited partnerships to pay expenses that were not the expenses of the limited partnerships and were instead the expenses of other companies that Paul controlled.

15.     The funds so used could instead have been distributed to limited partners, spent on improvements to the limited partnership's assets, reserved for unforeseen expenses, or used to reduce debt secured by the limited partnership's assets.

16.     Paul and his associates routinely concealed their wrongful use of the limited partnerships' funds by providing false financial reports to the limited partners.  When World Class companies owed money to a limited partnership, Paul and his associates often sent the limited partners false financial statements for the limited partnership that concealed the use of the limited partnership's funds to pay expenses of other World Class companies.

**Background – Limited Partnership Agreements**

17.     The Agreement of Limited Partnership that governed each of the relevant limited partnerships contained the following terms and provisions.

18.     Section 5.4, entitled "Duties and Obligations of General Partner," stated in pertinent part, "(a) The General Partner shall cause the Partnership to conduct its business and operations separate and apart from that of any General Partner or any of its Affiliates, including, without limitation, (i) segregating Partnership assets and not allowing funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of, any General Partner or any of its Affiliates …."

19.     Section 5.4 also stated, "(c) The General Partner shall conduct the affairs of the Partnership in the best interests of the Partnership, including, without limitation, the safekeeping and use of all of the Partnership Property and the use thereof for the exclusive benefit of the Partnership and will not conduct the affairs of the Partnership so as to benefit any other business now owned or hereafter acquired by any Partner if such conduct also produces a detriment to the Partnership."

20.     Section 8.2, entitled "Reports," stated that the "General Partner shall be responsible for the preparation of financial reports of the Partnership."   It also provided that the General Partner would cause quarterly and annual financial reports (hereafter collectively referred to as "periodic reports") to be provided to the partners.

**Background – Periodic Reports to Limited Partners**

21.     From the formation of the relevant limited partnerships until 2019, Paul and his associates provided periodic reports to limited partners.  Although some of the periodic reports included additional items, all of them included a balance sheet; an income statement; notes to financial statements; and a letter or memorandum to the limited partners over Paul's typewritten signature, commenting on the business operations of the limited partnership.

22.     The balance sheet included a line for "Cash and Cash Equivalents," and one of the notes to the financial statements provided additional detail, including an amount of "operating cash."  The balance sheet also usually included a line for "Accounts Receivable."

23.     A World Class property manager usually prepared the first draft of the letter or memorandum to limited partners.  Accountants employed by the World Class companies, acting at Paul's direction, generated the financial statements and notes to financial statements.  The accountants then submitted the complete package to Paul for his review and approval before it was distributed to the limited partners by Paul or one of his associates.

*[Blank Space]*

**Count One**
**Conspiracy to Commit Wire Fraud**
**[18 U.S.C. §§ 1343, 1349]**

24.     Paragraphs 1 through 23 above are incorporated into this Count by reference as if fully set forth herein.

25.     Beginning in or about 2011 and continuing until in or about July of 2019, in the Western District of Texas and elsewhere, Defendant

**Natin Paul a/k/a Nate Paul,**

knowingly and with intent to defraud, conspired and agreed with persons known and unknown to the Grand Jury (hereafter Paul's "co-conspirators") to commit the offense of wire fraud, a violation of 18 U.S.C. § 1343.   Having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, Paul and his co-conspirators conspired and agreed to transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds for the purpose of executing their scheme and artifice.

**Purpose and Object of the Conspiracy**

26.     The purpose and object of the conspiracy was (i) to obtain money from limited partners by falsely and fraudulently representing and promising that the general partner of each partnership would segregate the partnership's assets and cause them to be used exclusively for the benefit of the partnership; (ii) to use limited partnership funds secretly for the expenses of other World Class companies; (iii) to conceal the misuse of limited partnership funds by creating false periodic reports and providing them to limited partners; and (iv) by concealing those facts, both (A) decrease the likelihood that limited partners would disrupt the co-conspirators'

unrestricted use of limited partnership funds; and (B) increase the likelihood that the limited partners would invest additional money in the limited partnership or invest in other World Class companies and ventures in the future.

**Manner and Means of the Conspiracy**

27.     Paul and his co-conspirators agreed and endeavored to achieve the purpose and object of the conspiracy in the following manner and by the following means.

28.     Paul and his co-conspirators would and did promote each relevant limited partnership to potential investors based on the merits of the specific real estate that that limited partnership would acquire and own.

29.     Paul would and did sign, for each of the relevant limited partnerships, a limited partnership agreement governing the limited partnership, which included Sections 5.4 and 8.2 described above or substantially similar terms and provisions.

30.     Paul and his co-conspirators would and did establish one or more bank accounts for and in the name of each of the relevant limited partnerships.

31.     Paul and his co-conspirators would and did accept investment funds from limited partners and collect rent and other funds generated by the real estate that each of the relevant limited partnerships owned (hereafter sometimes referred to as each partnership's "limited partnership funds").

32.     Paul and his co-conspirators would and did, without notifying the limited partners, routinely transfer limited partnership funds from a bank account held by and in the name of a limited partnership to one or more bank accounts held by other World Class companies, including but not limited to World Class Capital Group, LLC.

33.     Paul and his co-conspirators would and did routinely use the limited partnership funds of a particular limited partnership to pay expenses of other World Class companies without notifying the limited partners.

34.     Co-conspirators who were accountants employed by World Class would and did track the amounts that the World Class companies owed to a particular limited partnership, or that the limited partnership owed to the World Class companies (such as management fees), in a "due-to/due-from" account on the limited partnership's general ledger.  A receivable balance in that account, reflected by a positive dollar value, signified a net obligation from the World Class companies to the limited partnership, whereas a payable balance, reflected by a negative dollar value, signified a net obligation by the limited partnership to the World Class companies.

35.     Paul and his co-conspirators would and did fail to disclose the receivable balances in a limited partnership's due-to/due-from account to the limited partners.  In the periodic reports that limited partners received, the amount of money that World Class companies owed to the limited partnership was not included in the "accounts receivable" amount on the limited partnership's balance sheet.

36.     Instead, Paul and his co-conspirators would and did include some or all of the amount that World Class companies owed to the limited partnership in the amount of the limited partnership's "operating cash" in the notes to financial statements.

37.     On the occasions when that occurred, the periodic report provided to the limited partners was false because (i) the balance sheet concealed the fact that World Class companies owed money to the limited partnership; (ii) the "cash and cash equivalents" amount on the balance sheet was greater than the amount of cash and cash equivalents that the limited partnership actually had; and (iii) the "operating cash" amount in the notes to financial

statements was greater than the amount of operating cash that the limited partnership actually had.

38.     Paul and his co-conspirators would and did use electronic mail, in interstate and foreign commerce, to provide false periodic reports to limited partners in the relevant limited partnerships, including the following reports:

a.     Paul and his co-conspirators provided to the North Carolina Limited Partner, a person known to the Grand Jury, a report for WC Metropolitan Northtown, LP for the quarter ended March 31, 2017.  The report showed accounts receivable of $277,430, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $1,248,450.69.  The report also showed operating cash of $538,850, whereas the partnership's bank accounts actually held only $20,685.48.

b.     Paul and his co-conspirators provided to the Florida Limited Partner, a person known to the Grand Jury, a report for WC Huron Denver, LP for the quarter ended June 30, 2018.  The report showed accounts receivable of $73,456, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $283,488.30.  The report showed operating cash in the amount of $388,853, whereas the partnership's bank accounts actually held only $982.81.

c.     Paul and his co-conspirators provided to the Texas Limited Partner, a person known to the Grand Jury, a report for WC 4th and Rio Grande, LP for the quarter ended December 31, 2016.  The report showed accounts receivable of $11,169, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $4,341,452.24.  The report also showed operating cash of $591,126, whereas the partnership's bank accounts only held $2,707.36.

d.      Paul and his co-conspirators provided to the Texas Limited Partner, a person known to the Grand Jury, a report for WC 6th and Rio Grande, LP for the quarter ended December 31, 2017.  The report showed accounts receivable of $5,179, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $1,159,808.56.  The report also showed operating cash of $339,945, whereas the partnership's bank accounts only held $37,835.73.

e.      Paul and his co-conspirators provided to the Texas Limited Partner, a person known to the Grand Jury, a report for WC Thousand Oaks Center, LP for the quarter ended June 30, 2017.  The report showed accounts receivable of $99,747, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $442,488.22.  The report also showed operating cash of $269,587, whereas the partnership's bank accounts had a combined negative balance of ($315.64).

f.      Paul and his co-conspirators provided the periodic reports described in Counts Two, Three, and Four of this Superseding Indictment.

In violation of 18 U.S.C. §§ 1343 and 1349.

*[Blank Space]*

**Count Two**
**Wire Fraud**
**[18 U.S.C. §§ 1343 and 2]**

39.     Paragraphs 1 through 37 above are incorporated into this Count by reference as if fully set forth herein.

40.     On or about December 17, 2018, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul,**

knowingly and with intent to defraud, both personally and by and through persons acting at his direction, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds for the purpose of executing his scheme and artifice.

41.     Specifically, one of Paul's associates, a person known to the Grand Jury, acting at Paul's direction, sent by electronic mail to the North Carolina Limited Partner, a person known to the Grand Jury, a false periodic report for one of the relevant limited partnerships.

42.     The report was for WC Thousand Oaks Center, LP for the quarter ended September 30, 2018.  It showed accounts receivable of $62,555, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $504,954.50.  The report also showed operating cash of $343,986, whereas the partnership's bank accounts actually held only $3,656.87.

In violation of 18 U.S.C. §§ 1343 and 2.

**Count Three**
**Wire Fraud**
**[18 U.S.C. §§ 1343 and 2]**

43.     Paragraphs 1 through 37 above are incorporated into this Count by reference as if fully set forth herein.

44.     On or about May 19, 2019, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul,**

knowingly and with intent to defraud, both personally and by and through persons acting at his direction, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds for the purpose of executing his scheme and artifice.

45.     Specifically, one of Paul's associates, a person known to the Grand Jury, acting at Paul's direction, sent by electronic mail to the Colorado Limited Partner, a person known to the Grand Jury, a number of false periodic reports for WC Thousand Oaks Center, LP.

46.     The report for the quarter ended March 31, 2017 showed accounts receivable of $90,914, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $427,828.69.  The report showed operating cash of $238,083, whereas the partnership's bank accounts actually held only $14,277.34.

47.     Another false report attached to the electronic mail message was for the quarter ended June 30, 2017, and that report is described above in Paragraph 38.e., which is incorporated herein by reference as if fully set forth herein.

48.     The report for the quarter ended March 31, 2018 showed accounts receivable of $97,359, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $571,572.12.  The report also showed operating cash of $289,832, whereas the partnership's bank accounts actually held only $417.45.

49.     The report for the quarter ended June 30, 2018 showed accounts receivable of $90,427, whereas the partnership's true accounts receivable amount, including amounts that World Class companies owed to the partnership, was $436,834.95.  The report also showed operating cash of $310,186, whereas the partnership's bank accounts actually held only $18,669.52.

50.     Another false report attached to the electronic mail message was for the quarter ended September 30, 2018, and that report is described above in Paragraph 42, which is incorporated herein by reference as if fully set forth herein.

In violation of 18 U.S.C. §§ 1343 and 2.

**Count Four**
**Wire Fraud**
**[18 U.S.C. §§ 1343 and 2]**

51.     Paragraphs 1 through 37 above are incorporated into this Count by reference as if fully set forth herein.

52.     On or about July 23, 2019, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul,**

knowingly and with intent to defraud, both personally and by and through persons acting at his direction, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and cause to be transmitted by means of wire, radio,

and television communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds for the purpose of executing his scheme and artifice.

53.     Specifically, one of Paul's associates, a person known to the Grand Jury, acting at Paul's direction, sent by electronic mail to the Texas Limited Partner, a person known to the Grand Jury, a number of false periodic reports for WC Thousand Oaks Center, LP.  The reports were for the quarters ended March 31, 2018, which report is described above in Paragraph 48; for June 30, 2018, which report is described above in Paragraph 49; and for September 30, 2018, which report is described above in Paragraph 42 (paragraphs 42, 48, and 49 above all being incorporated herein by reference as if fully set forth herein).

In violation of 18 U.S.C. §§ 1343 and 2.

## Part Three:  False Statements to Lenders
### (Counts Five through Twelve)

**Introduction and Summary**

54.     When Paul acquires real estate through one of the World Class companies, he customarily finances part of the purchase price by arranging for a financial institution to make a loan to the company that will own the property, or to an affiliated company.

55.     From March 2017 through April 2018, Paul made a number of false statements and reports for the purpose of influencing financial institutions to make loans to Paul's companies.  The combined principal amount of the loans that Paul obtained was approximately $172,000,000.

56.     On three occasions, Paul gave a financial institution a false and counterfeit document, representing that one of Paul's bank accounts held millions of dollars when in fact the balance of the account was less than $13,000.

57.     On other occasions, Paul under-represented the amount of his liabilities or over-represented the amount of cash that he had.

58.     In one instance, Paul falsely represented that he indirectly held 100% of the limited liability company interests in the company that was the borrower on the loan, whereas Paul knew that a company of which the lender was unaware, which Paul neither owned nor controlled, held a 91% limited liability company interest in the parent of the borrower and had certain undisclosed rights of control over the borrower.

**Background – Lender Due Diligence**

59.     At all times relevant to Part Three of this Superseding Indictment, the following were true.

60.     Financial institutions (hereafter "lenders") made loans only after investigating the risk that the borrower might fail to repay the funds or otherwise fail to comply with the terms of the loan agreement.

61.     Lenders obtained the pertinent information through a process that was sometimes referred to as "due diligence" or "underwriting."  As part of that process, the lender requested information from the borrower.

62.     Among other matters, lenders inquired about the financial condition of the borrower.

63.     If the borrower was an organization established for a limited business purpose, such as owning and managing a single parcel of real estate, the lender inquired about the financial condition of any organization or individual, sometimes referred to as a "sponsor," that had a substantial ownership interest in or substantial control over the borrower.

64.     Lenders customarily inquired about the amount of money or "cash" that the borrower or sponsor held, as well as property that the borrower or sponsor could readily convert into cash.  The cash and the property that was readily convertible to cash were often referred to as the borrower or sponsor's "liquidity."

65.     Lenders also customarily inquired about the amount of debt that the borrower or sponsor owed.

66.     If the purpose of a loan was to purchase or refinance real estate, the lender typically had the right to take possession of the real estate if the borrower failed to satisfy certain terms of the loan agreement, including repayment of the loan.  That right was known as a "mortgage" or "security interest," and loans secured by an interest in real estate were commonly called "mortgage loans."

**Pertinent Statutes**

67.     Section 1014 of Title 18 of the United States Code ("Section 1014") provides that a person commits a crime if he or she "knowingly makes any false statement or report … for the purpose of influencing in any way the action of … an insured State-chartered credit union … or a mortgage lending business … upon any application, advance, … commitment, [or] loan …."

68.     Section 1014 provides that the term "State-chartered credit union" includes "a credit union chartered under the laws of a State of the United States."

69.     Section 27 of Title 18 of the United States Code provides that the term "mortgage lending business" (hereafter "MLB") means "an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce."

**Lenders and Affiliates**

At all times relevant to Part Three this Superseding Indictment, the following were true.

70.     A credit union known to the Grand Jury (hereafter "the Credit Union") was chartered under the laws of the State of Texas and did business in Austin, Texas.  The Credit Union's members' deposits were insured by the National Credit Union Administration, an independent agency of the United States.

71.     An Irish lender known to the Grand Jury (hereafter "the Ireland MLB") was in the business of financing and refinancing debt secured by interests in real estate, and its activities affected interstate and foreign commerce.  Therefore, it was a "mortgage lending business" as defined by Section 27 of Title 18 of the United States Code.

72.     A California firm known to the Grand Jury (hereafter "the California Advisor") acted as an agent for and advisor to the Ireland MLB in relation to mortgage loans made by the Ireland MLB.  Among other functions, the California Advisor performed due diligence related to loans made by the Ireland MLB.

73.     A Greenwich, Connecticut lender known to the Grand Jury (hereafter "the Connecticut MLB") was in the business of financing and refinancing debt secured by interests in real estate, and its activities affected interstate and foreign commerce.  Therefore, it was a "mortgage lending business" as defined by Section 27 of Title 18 of the United States Code.

74.     An affiliate of the Connecticut MLB known to the Grand Jury (hereafter "the Chicago Affiliate") had offices in Chicago, Illinois and performed due diligence related to mortgage loans made by the Connecticut MLB.

75.     A New York, New York lender known to the Grand Jury (hereafter "the New York MLB") was in the business of financing and refinancing debt secured by interests in real

estate, and its activities affected interstate and foreign commerce.  Therefore, it was a "mortgage

lending business" as defined by Section 27 of Title 18 of the United States Code.

**Count Five**
**False Statement and Report to Insured State-Chartered Credit Union**
**[18 U.S.C. § 1014]**

76.     Paragraphs 1 through 7 and 54 through 70 above are incorporated into this Count

by reference as if fully set forth herein.

77.     On or about March 14, 2017, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the

Credit Union upon an application, advance, commitment, and loan.  Specifically, Paul stated and

reported to representatives of the Credit Union that he held "$31.6 million" in cash in a specific

account numbered ***-*0767 (hereafter "the 767 Account").  In fact, however, as Paul knew,

that account held less than $500,000 in cash, and the remainder of the assets in the account were

securities.

78.     In March 2017, Paul was seeking two loans from the Credit Union.

a.      One was a $2,713,252 loan from the Credit Union to WC 707 Cesar

Chavez, LLC, a company Paul directly or indirectly owned and controlled.

b.      The other was a $6,540,000 loan from the Credit Union to WC Custer

Creek Center Property, LLC, a company Paul directly or indirectly owned and controlled.

c.      The Credit Union made the loans to WC 707 Cesar Chavez, LLC and WC

Custer Creek Center Property, LLC in or about April 2017.

79.     On March 14, 2017, a representative of the Credit Union in Austin, Texas emailed

Paul.  He asked whether Paul could "provide bank statements" for "the largest cash balances"

making up "$32 million in cash" that Paul had listed among his assets on a personal financial statement.  Paul replied, "Yes".

80.     Later on March 14, 2017, the Credit Union's representative emailed Paul "a consolidated list of outstanding items" for the Credit Union's due diligence, which included "Bank statements for largest cash balances."

81.     Paul replied, stating, "Attached is my account statement from today … with a balance of $31.6 million."  To his email, Paul attached a screen shot from a bank Internet site, showing $31,681,316.43 in the 767 Account on March 14, 2017.

82.     Paul knew that the 767 Account held less than $500,000 in cash, and that the remainder of the account's value consisted of securities.  Therefore, Paul knowingly made a false statement and report when he represented that the 767 Account held $31.6 million in cash.

83.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Credit Union on Paul's application for the loans to WC 707 Cesar Chavez, LLC and WC Custer Creek Center Property, LLC.

In violation of 18 U.S.C. § 1014.

**Count Six**
**False Statement and Report to Mortgage Lending Business**
**[18 U.S.C. § 1014]**

84.     Paragraphs 1 through 7, 54 through 69, 71, and 72 above are incorporated into this Count by reference as if fully set forth herein.

85.     On or about December 10, 2017, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the Ireland MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and

reported that, as of November 30, 2017, he owed only $3,422,056 in "Total liabilities."  In fact, however, as Paul knew, he owed on November 30, 2017, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

86.     In December 2017, Paul was seeking a $15,000,000 loan from the Ireland MLB to WC 56 East Avenue LLC, a company Paul directly or indirectly owned and controlled.   The Ireland MLB made the loan to WC 56 East Avenue LLC on or about December 12, 2017.

87.     On or about December 10, 2017, the California Advisor was acting on behalf of the Ireland MLB, conducting due diligence in relation to the loan to WC 56 East Avenue LLC, when Paul sent an email from Austin, Texas to a representative of the California Advisor.

88.     Paul's email stated, "Attached is my personal financial statement…."  A two-page document attached to the email, entitled "Natin Paul - Statement of Financial Condition - November 30, 2017," listed "Assets" in one section and "Liabilities" in another section.

89.     The "Liabilities" section listed Paul's "Total liabilities" as $3,422,056.  On or about December 10, 2017, however, Paul knew that on November 30, 2017 he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that the personal financial statement disclosed.  Therefore, Paul knowingly made a false statement and report when he said that the amount of his total liabilities was only $3,422,056.

90.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Ireland MLB on Paul's application for the loan to WC 56 East Avenue LLC.

In violation of 18 U.S.C. § 1014.

## Count Seven
## False Statement and Report to Mortgage Lending Business
## [18 U.S.C. § 1014]

91.     Paragraphs 1 through 7, 54 through 69, 71, and 72 above are incorporated into this Count by reference as if fully set forth herein.

92.     On or about December 11, 2017, in the Western District of Texas, Defendant

### Natin Paul a/k/a Nate Paul

knowingly made a false statement and report for the purpose of influencing the action of the Ireland MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that a document Paul provided to the California Advisor "for verification of liquidity," reflecting an account value of $14,203,464.39, was part of the November 30, 2017 statement of a specific account numbered ***-*5175 and held by Paul (hereafter "the 5175 Account").  In fact, however, as Paul knew, the document he sent was false and counterfeit, and the genuine November 30, 2017 statement of the 5175 Account reflected a true account value less than $13,000.

93.     Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm").  Paul alone held and controlled the 5175 Account.

94.     In December 2017, as described in Count Six above, Paul was seeking a $15,000,000 loan from the Ireland MLB to WC 56 East Avenue LLC, and the California Advisor was performing due diligence on behalf of the Ireland MLB in relation to the loan.  The Ireland MLB made the loan to WC 56 East Avenue LLC on or about December 12, 2017.

95.     On December 10, 2017, as described in Count Six above, a representative of the California Advisor received Paul's personal financial statement from Paul.  Among the assets listed was "Cash in banks" with a value of "$13,250,000."

96.     On December 11, 2017, Paul sent an email from Austin, Texas to the California Advisor's representative, stating, "Per your request, attached is my [Century City Firm] statement for verification of liquidity."

97.     Attached to the email was a single page labeled "Page 1 of 5" of an "Account Statement" from the Century City Firm.  The "Statement" purported to relate to the 5175 Account and the period "November 1, 2017 – November 30, 2017."

98.     The page included the following section entitled "Account Value Summary":

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
| --- | --- | --- |
| **Beginning account value** | $14,186,251.74 | $0.00 |
| Deposits | 0.00 | 15,300,000.00 |
| Withdrawals | 0.00 | -1,290,000.00 |
| Taxable income | 17,212.65 | 193,464.39 |
| **Ending account value** | $14,203,464.39 | $14,203,464.39 |

99.     The document that Paul attached to his December 11, 2017 email was not, as he stated and reported to the California Advisor's representative, his "statement" or a true copy of part of his statement.  As Paul knew on or about December 11, 2017, the document he sent was false and counterfeit, and the dollar figures in the "Account Value Summary" were not the true dollar figures that appeared in the genuine November 30, 2017 statement for the 5175 Account.

100.    In the genuine November 30, 2017 statement for the 5175 Account, the "Account Value Summary" is the following:

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
| --- | --- | --- |
| **Beginning account value** | $12,099.39 | $0.00 |
| Deposits | 0.00 | 8,300,000.00 |
| Withdrawals | 0.00 | -8,291,361.39 |
| Taxable income | 2.65 | 3,463.43 |
| **Ending account value** | $12,102.04 | $12,102.04 |

101.    Therefore, Paul knowingly made a false statement and report when he said that the document he sent to the California Advisor's representative was a statement of the 5175 Account.

102.    Paul knowingly made that false statement and report for the purpose of influencing the action of the Ireland MLB on his application for the loan to WC 56 East Avenue LLC.

In violation of 18 U.S.C. § 1014.

### Count Eight
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

103.    Paragraphs 1 through 7, 54 through 69, 73, 74, and 97 through 100 above are incorporated into this Count by reference as if fully set forth herein.

104.    On or about December 11, 2017, in the Western District of Texas, Defendant

### Natin Paul a/k/a Nate Paul

knowingly made a false statement and report for the purpose of influencing the action of the Connecticut MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that a document Paul provided to the Chicago Affiliate "for the last outstanding item needed for evidence of liquidity," reflecting an account value of $14,203,464.39, was part of the November 30, 2017 statement of a specific account numbered

***-*5175 and held by Paul (hereafter "the 5175 Account"). In fact, however, as Paul knew, the document he sent was false and counterfeit, and the genuine November 30, 2017 statement of the 5175 Account reflected a true account value less than $13,000.

105.    Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm"). Paul alone held and controlled the 5175 Account.

106.    In December 2017, Paul was seeking a $33,600,000 loan from the Connecticut MLB to WC South Congress Square, LLC, a company Paul directly or indirectly owned and controlled. The Connecticut MLB made the loan to WC South Congress Square, LLC on or about December 14, 2017.

107.    In December 2017, the Chicago Affiliate was performing due diligence on behalf of the Connecticut MLB in relation to the loan to WC South Congress Square, LLC.

108.    On or about December 11, 2017, Paul sent an email from Austin, Texas to a representative of the Chicago Affiliate, stating, "Attached is my [Century City Firm] statement for the last outstanding item needed for evidence of liquidity. Look forward to closing this transaction."

109.    Attached to Paul's email was the same false and counterfeit document described in Count Seven above, reflecting an account value of $14,203,464.39 in the 5175 Account.

110.    The document that Paul attached to his December 11, 2017 email was not, as he stated and reported to the Chicago Affiliate's representative, his "statement" or a true copy of part of his statement. As Paul knew, on or about December 11, 2017, the document he sent was false and counterfeit, and the dollar figures in the "Account Value Summary" were not the true dollar figures that appeared in the genuine November 30, 2017 statement for the 5175 Account.

111.    In the genuine November 30, 2017 statement for the 5175 Account, the "Account Value Summary" reflects the amount $12,102.04, as described in Count Seven above. Therefore, Paul knowingly made a false statement and report when he said that the document he sent to the Chicago Affiliate's representative was part of a statement of the 5175 Account.

112.    Paul knowingly made that false statement and report for the purpose of influencing the action of the Connecticut MLB on his application for the loan to WC South Congress Square, LLC.

In violation of 18 U.S.C. § 1014.

### Count Nine
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

113.    Paragraphs 1 through 7, 54 through 69, and 75 above are incorporated into this Count by reference as if fully set forth herein.

114.    On or about December 20, 2017, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the New York MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that, as of November 30, 2017, he held $25,250,000 of "Cash in banks" and owed only $3,422,056 in "Total liabilities."  In fact, however, as Paul knew, he held substantially less than $25,250,000 of cash and owed, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

115.    In December 2017, Paul was seeking a $64,000,000 loan from the New York MLB to Silicon Hills Campus, LLC (hereafter "Silicon Hills"), a company Paul then directly or

indirectly owned and controlled, for the purchase of 158 acres and several buildings in northwest Austin.  The New York MLB made the loan to Silicon Hills on or about February 6, 2018.

116.    In December 2017, the New York MLB was conducting due diligence in relation to the loan to Silicon Hills.

117.    On or about December 20, 2017, Paul sent an email from Austin, Texas to a representative of the New York MLB, stating, "Attached is my Personal Financial Statement …. Please contact me directly with any questions."  A two-page document attached to the email was entitled "Natin Paul - Statement of Financial Condition - November 30, 2017."

118.    That document was nearly identical to the personal financial statement that Paul sent to the California Advisor on December 10, 2017, when Paul was seeking a loan from the Ireland MLB, as described in Count Six and Count Seven above.

119.    The November 30, 2017 personal financial statement that Paul sent to the New York MLB on December 20, 2017 differed from the earlier November 30, 2017 personal financial statement mainly in that the amount of "Cash in banks" on the version received by the New York MLB was $25,250,000 rather than $13,250,000.  (The "Total Assets" and "Net worth" figures also increased.)

120.    On or about December 20, 2017, Paul knew that, on November 30, 2017, he held substantially less than $25,250,000 in cash.

121.    Like the earlier version of the November 30, 2017 personal financial statement, the version that Paul sent to the New York MLB on December 20, 2017 reported "Total liabilities" of $3,422,056.

122.    On or about December 20, 2017, however, Paul knew that, on November 30, 2017, he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that his personal financial statement disclosed.

123.    Therefore, Paul knowingly made a false statement and report when he represented that, on November 30, 2017, he held $25,250,000 of cash and owed total liabilities of only $3,422,056.

124.    Paul knowingly made that false statement and report for the purpose of influencing the action of the New York MLB on his application for the loan to Silicon Hills.

In violation of 18 U.S.C. § 1014.

### Count Ten
### False Statement and Report to Mortgage Lending Business
### [18 U.S.C. § 1014]

125.    Paragraphs 1 through 7, 54 through 69, and 75 above are incorporated into this Count by reference as if fully set forth herein.

126.    On or about February 6, 2018, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the New York MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that he indirectly held, through a series of companies, 100% of the limited liability company interests in Silicon Hills Campus, LLC (hereafter "Silicon Hills"), the borrower on a $64,000,000 loan from the New York MLB, and that no parties other than ones that Paul wholly owned and controlled had any right of control over Silicon Hills.  In fact, as Paul knew, a limited liability company known to the Grand Jury that had its principal place of business in Los Angeles, California (hereafter "the LA LLC") held a 91% limited liability company interest in

World Class Holdings VII, LLC (hereafter "WCH VII"), which directly held 100% of the limited

liability company interests in Silicon Hills, and the LA LLC also had certain rights of control

over Silicon Hills.

127.    In February 2018, Paul obtained a $64,000,000 loan from the New York MLB to

Silicon Hills for the purchase of 158 acres and several buildings in northwest Austin, Texas

(hereafter "the Silicon Hills property").

128.    On or about February 6, 2018, in Austin, Texas, Paul, acting as President of

Silicon Hills, signed the Loan Agreement for the loan to Silicon Hills.

129.    In a section of the Loan Agreement entitled "Borrower Representations," the

"Borrower represent[ed] and warrant[ed] to Lender" that an "organizational chart attached as

Schedule IV hereto, relating to Borrower and certain Affiliates and other parties, is true,

complete, and correct on and as of the date hereof.  No person other than those Persons shown on

Schedule IV have any ownership interest in, or right of Control, directly or indirectly, in

Borrower."

130.    The organizational chart that was attached to the Loan Agreement as Schedule IV

appears on the next page of this Superseding Indictment.  It reflected that Paul wholly owned

World Class Holding Company, LLC, which wholly owned World Class Holdings, LLC, which

wholly owned WCH VII, which wholly owned Silicon Hills.


*[Blank Space]*



**SCHEDULE IV**

**ORGANIZATIONAL CHART**

\*\*All entities are Delaware limited liability companies

S-IV-1

EAST\149310333.9

131.     That organizational chart, and the Borrower Representation about its accuracy and completeness, were false.

132.     On or about February 6, 2018, Paul, as the President of World Class Holdings, LLC, the Managing Member of WCH VII, signed an Amended and Restated Limited Liability Company Agreement for WCH VII.  Under that agreement, as Paul knew:

    a.      the LA LLC, a company in which Paul had no ownership interest and over which he had no control, became the Class B Member of WCH VII;

    b.      the LA LLC contributed more than $14,500,000 toward the purchase of the Silicon Hills property;

    c.      the LA LLC held a 91% limited liability company interest in WCH VII;

    d.      the LA LLC directly or indirectly held certain rights of control over Silicon Hills, including, among other rights, the right under certain circumstances to force WCH VII, as the manager of Silicon Hills, to cause the sale of the Silicon Hills property and use the sale proceeds to pay amounts owed to the LA LLC; and

    e.      World Class Holdings, LLC held only a 9% limited liability company interest in WCH VII.

133.     Therefore, by signing the Loan Agreement, Paul knowingly made a false statement and report that he indirectly held 100% of the limited liability company interests in Silicon Hills, and that no parties other than ones that Paul wholly owned and controlled had any right of control over Silicon Hills.  Paul knew that the LA LLC, which did not appear on the organizational chart and was unknown to the New York MLB, held a 91% limited liability company interest in WCH VII, the holder of 100% of the limited liability company interests in Silicon Hills, and directly or indirectly held certain rights of control over Silicon Hills.

134.    Paul knowingly made that false statement and report, on or about February 6, 2018, for the purpose of influencing the action of the New York MLB on Paul's application for the $64,000,000 loan to Silicon Hills.

In violation of 18 U.S.C. § 1014.

### Count Eleven
### False Statement and Report to Insured State-Chartered Credit Union
### [18 U.S.C. § 1014]

135.    Paragraphs 1 through 7 and 54 through 70 above are incorporated into this Count by reference as if fully set forth herein.

136.    On or about March 27, 2018, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the Credit Union upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that, as of March 1, 2018, he owed only $3,307,281 in "Total liabilities."  In fact, as Paul knew, he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities he disclosed.

137.    In March 2018, Paul was seeking a $2,730,000 loan from the Credit Union to WC Alamo Industrial Center, LP, a company Paul directly or indirectly controlled.  The Credit Union made the loan to WC Alamo Industrial Center, LP in or about May 2018.

138.    On or about March 27, 2018, the Credit Union was conducting due diligence in relation to the loan, when Paul sent an email to representatives of the Credit Union in Austin, Texas, stating, "Attached is my updated PFS.  Please let me know if you have any questions.  We look forward to closing this transaction with you."

139.     A two-page document attached to the email was entitled "Natin Paul - Statement of Financial Condition – March 1, 2018."  At the end of the "Liabilities" section, Paul's "Total liabilities" were listed as $3,307,281.

140.     On or about March 27, 2018, however, Paul knew that on March 1, 2018 he owed, directly or indirectly, at least $28,620,000 in addition to the liabilities that his personal financial statement disclosed.

141.     Therefore, Paul knowingly made a false statement and report when he said that the amount of his "Total liabilities" was only $3,307,281.

142.     Paul knowingly made that false statement and report for the purpose of influencing the action of the Credit Union on his application for the loan to WC Alamo Industrial Center, LP.

In violation of 18 U.S.C. § 1014.

## Count Twelve
## False Statement and Report to Mortgage Lending Business
## [18 U.S.C. § 1014]

143.     Paragraphs 1 through 7, and 54 through 69, 71, and 72 above are incorporated into this Count by reference as if fully set forth herein.

144.     On or about April 19, 2018, in the Western District of Texas, Defendant

**Natin Paul a/k/a Nate Paul**

knowingly made a false statement and report for the purpose of influencing the action of the Connecticut MLB upon an application, advance, commitment, and loan.  Specifically, Paul stated and reported that a document Paul provided to the Chicago Affiliate "for evidence of liquidity," reflecting an account value of $18,566,363.98, was part of the March 31, 2018 statement of a specific account numbered ***-*5175 and held by Paul (hereafter "the 5175

Account"). In fact, however, as Paul knew, that document was false and counterfeit, and the genuine March 31, 2018 statement of the 5175 Account reflected a true account value less than $13,000.

145.    Paul held the 5175 Account at a wealth management firm known to the Grand Jury that did business in Century City, California (hereafter "the Century City Firm"). Paul alone held and controlled the 5175 Account.

146.    In April 2018, Paul was seeking a $48,200,000 loan from the Connecticut MLB to WC Met Center, LLC, a company Paul directly or indirectly owned and controlled. The Connecticut MLB made the loan to WC Met Center, LLC on or about April 19, 2018.

147.    In April 2018, the Chicago Affiliate was performing due diligence on behalf of the Connecticut MLB in relation to the loan.

148.    On or about April 19, 2018, Paul sent an email message from Austin, Texas to a representative of the Chicago Affiliate, stating, "Attached is my most recent [Century City Firm] statement for evidence of liquidity. Look forward to closing this transaction."

149.    Attached to Paul's email was a single page labeled "Page 1 of 5" of an "Account Statement" from the Century City Firm. The "Statement" purported to relate to the 5175 Account and the period "March 1, 2018 – March 31, 2018."

150.    The page included the following section entitled "Account Value Summary":

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
|---|---|---|
| **Beginning account value** | $18,476,578.44 | $18,279,050.25 |
| Taxable Income | 89,785.54 | 287,313.73 |
| **Ending account value** | $18,566,363.98 | $18,566,363.98 |

151.    The document that Paul attached to his April 19, 2018 email was not, as he stated and reported to the Chicago Affiliate's representative, his "statement" or a true copy of part of his statement.  As Paul knew on or about April 19, 2018, the document he sent was false and counterfeit in that the dollar figures in the "Account Value Summary" were not the true dollar figures that appeared in the genuine March 31, 2018 statement for the 5175 Account.

152.    In the genuine March 31, 2018 statement for the 5175 Account, the "Account Value Summary" is the following:

## ACCOUNT VALUE SUMMARY

|  | THIS PERIOD | THIS YEAR |
| --- | --- | --- |
| **Beginning account value** | $12,113.10 | $12,104.44 |
| Taxable income | 4.18 | 12.84 |
| **Ending account value** | $12,117.28 | $12,117.28 |

153.    Therefore, Paul knowingly made a false statement and report when he said that the document he sent to the Chicago Affiliate's representative was part of a statement of the 5175 Account.

154.    Paul knowingly made that false statement and report for the purpose of influencing the action of the Connecticut MLB on his application for the $48,200,000 loan to WC Met Center, LLC.

In violation of 18 U.S.C. § 1014.

## Notice of Government's Demand for Forfeiture
### [*See* Fed. R. Crim. P. 32.2]

## I.

## False Statements and Reports to Lenders
## Violation and Forfeiture Statutes
### [18 U.S.C. § 1014, subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2)]

As a result of the criminal violations set forth above in Counts Five through Twelve, the

United States gives notice to Defendant **Natin Paul a/k/a Nate Paul** of its intent to seek the

forfeiture of certain properties upon conviction pursuant to Fed. R. Crim. P. 32.2 and 18 U.S.C. §

982(a)(2), which states in pertinent part the following:

**18 U.S.C. § 982. Criminal Forfeiture**

\* \* \*

**(a)(2)** The Court, in imposing sentence on a person convicted of a violation of, or a
conspiracy to violate—

**(a)** section . . . 1014 . . . of this title, affecting a financial institution . . .

shall order that the person forfeit to the United States any property constituting, or
derived from, proceeds the person obtained directly or indirectly, as the result of such
violation.

This Notice of Demand for Forfeiture includes but is not limited to the properties

described below in Paragraphs II, III, and IV.

## II.
## Properties

Any and all property constituting and/or derived from, or property used or intended to be

used in the commission of, the criminal offense.

## III.
## Money Judgment

**Money Judgment**:  A sum of money equal to One Hundred Seventy Million dollars

($172,000,000) that represents the value of the proceeds obtained directly or indirectly from the

violations charged in Counts Five through Twelve set forth above, for which Defendant **Natin**

**Paul a/k/a Nate Paul** is liable.

## IV.
### Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set

forth above, as a result of any act or omission of the Defendant:

    a.     cannot be located upon the exercise of due diligence;
    b.     has been transferred or sold to, or deposited with, a third party;
    c.     has been placed beyond the jurisdiction of the Court;
    d.     has been substantially diminished in value; or
    e.     has been commingled with other property which cannot be divided
          without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the

value of the money judgment, as substitute assets, pursuant to 21 U.S.C. § 853(p) and Fed. R.

Crim. P. 32.2(e)(1).

A TRUE BILL



JAIME ESPARZA
UNITED STATES ATTORNEY

By: _____
     ALAN M. BUIE
     ASSISTANT UNITED STATES ATTORNEY

_____
ROBERT ALMONTE II
ASSISTANT UNITED STATES ATTORNEY